**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION**

| | |
|---|---|
| ASHLEY AUSTIN, ) | |
| ) | No. 0:11-cv-02768-DCN-PJG |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| CAROLYN W. COLVIN, *Acting* ) | |
| *Commissioner of Social Security*,[1] ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the magistrate judge's Report and Recommendation (R&R) that this court affirm the Administrative Law Judge's (ALJ) decision denying plaintiff's application for child's insurance benefits based on disability. Plaintiff filed objections to the R&R. For the reasons set forth below, the court adopts the R&R and affirms the ALJ's decision.

## I. BACKGROUND

Plaintiff Ashley Austin filed an application for child's benefits[2] on April 14, 2008, alleging disability beginning June 1, 2003 due to the mental impairments of bipolar disorder and schizophrenia. Tr. 170. Her claim was denied initially and upon reconsideration by the Social Security Administration. The ALJ held a hearing on October 27, 2009 and issued a decision on December 18, 2009, finding Austin not disabled under the Social Security Act. Tr. 19-32, 33-65. The Appeals Council denied

---

[1] Carolyn W. Colvin is substituted for Michael J. Astrue as the named defendant because she became the Acting Commissioner of Social Security on February 14, 2013. See Fed. R. Civ. P. 25(d).

[2] In certain circumstances, a claimant is entitled to child's benefits if she is "18 years old or older and ha[s] a disability that began before [she] became 22 years old." 20 C.F.R. § 404.350(a)(5).

review, rendering the ALJ's decision that of the Commissioner of Social Security. Tr. 1-6.

On October 13, 2011, Austin filed a civil action seeking review of the ALJ's decision. Magistrate Judge Paige J. Gossett issued a ten-page R&R on January 23, 2013, recommending that the ALJ's decision was supported by substantial evidence and not contrary to law. R&R 9. Austin filed twenty-three pages of objections on February 11, 2013.

### A.     Treatment History

Austin was eighteen years old when she filed for benefits, alleging a period of disability beginning when she was thirteen. See Tr. 21, 31. She is a high school graduate and, at the time of the ALJ hearing, was attending college classes. Tr. 40. Austin has past relevant work experience as a cashier, bagger, and fast food cook. Tr. 31.

Austin testified at the hearing that she suffers from poor concentration and memory, confusion, nervousness, hallucinations, and difficulty sleeping. Tr. 43-47, 52-53. The earliest treatment records in evidence are dated June 21, 2004 and result from a visit to the Greenville Hospital System. Tr. 283-99. The records note Austin was "very confused." Tr. 295. Austin was referred to Greenville Mental Health, where she was introduced to Nurse Practitioner Claire McLain. Tr. 297, 319. In late 2004, Austin was prescribed medications such as Zyprexa, Prozac, and Depakote for her symptoms, but Austin's mother became distressed over Austin's weight gain and began giving less than the full recommended doses. Tr. 311, 319, 323-26. By January 2005, Austin was reported by another nurse to be "doing well [at] home and school." Tr. 326. However, in

March 2005, Austin complained of paranoia, confusion, and difficulty sleeping, and continued to receive medication and treatment.  Tr. 328-30.

Austin received inpatient evaluation and treatment for eleven days in March 2005 after complaining of anxiety, paranoia, panic attacks, and depression.  Tr. 307.  The discharge report ruled out schizophrenia, but noted that "[c]linically, based on her presentation, I do suspect that she has some schizophrenia spectrum disorder, which is currently evolving."  Tr. 304-05.  Following her treatment, in late March 2005, Nurse McLain observed Austin to be "much improved."  Tr. 331.  Nurse McLain continued to see Austin between November 2005 and August 2006, advising continuation of Austin's medications, with some adjustments, and therapy.  Tr. 334-40.

In November 2006, Dr. Edward N. Davis of Greenville Mental Health noted that Austin was "calm and cooperative" and recommended that Austin continue her current medications.  Tr. 354.  Dr. Davis also indicated that Austin's mother was "felt to be hypomanic."  Id.  Nurse McLain similarly expressed concerns in January 2007 about Austin's mother, noting "a history of adjusting medication without consulting the center's staff."  Tr. 356.  The mother admitted to self-adjusting Austin's medication in March 2007.  Tr. 358.  The next month, Nurse McLain saw Austin for a follow-up and reported she had missed appointments and not had therapy since November 2006.  Tr. 359.  Nurse McLain also observed Austin was performing well in school, id.; however, by September 2007, Austin complained of problems concentrating in school and experiencing hallucinations and anxiety.  Tr. 363.  Nurse McLain revised Austin's medication regimen and again encouraged compliance.  Id.

In October 2007, Austin reported she was "doing very well" on her medications, "functioning very well" at school, and "having no side effects with any of her medicines and [wa]s not depressed or psychotic," although she expressed concern about further weight gain. Tr. 364. However, in December 2007, Austin stated she had "completely changed" and was experiencing depression, lethargy, trouble concentrating, and hallucinations. Tr. 365. Dr. Davis observed that Austin's mood seemed to be improving and that medication should not change. Tr. 367. In January 2008, concerns were noted again with Austin's compliance with medication. See Tr. 368 ("She is worried about gaining weight and refuses to take Zyprexa or Seroquel ever again, she says, with her mother in agreement because both of them feel weight gain is worse than 'hearing voices.'"); Tr. 370 ("The client and her mother had adjusted the medications many times without consulting staff and at this time they do not want the client to go back on Seroquel even though it worked very well for her psychotic symptoms and for sleep."). Similarly, in February 2008, Dr. Davis noted, "Mother is adjusting the dosage of the medications on her own." Tr. 371. Dr. Davis "encouraged the mother strongly to give the medication as prescribed." Id.

Austin was admitted to the Carolina Center for Behavioral Health in April 2008. Tr. 378. She spent over a week at the Center from July to August 2008 as a result of a manic episode and for a psychiatric evaluation. Tr. 474. After Austin's discharge on August 2, 2008, she had an initial evaluation at Piedmont Mental Health. Tr. 454. It was noted later that month that Austin was "frequently noncompliant" with medication. Tr. 471. From September 2008 to May 2009, Austin was treated at Piedmont, during which time her symptoms were monitored and medication was adjusted. Tr. 357, 483, 485.

4

Treatment notes dated May 28, 2009, the most recent notes available, reflect "dramatic improvement." Tr. 485.

### B. Opinion Evidence

In July 2008, Robbie Ronin, a state agency medical consultant, completed a Mental Residual Functional Capacity Assessment. Tr. 415-18. Her evaluation found that Austin was "not significantly limited" in most areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation, with only a few areas marked "moderately limited." Tr. 415-16. In addition, she found that Austin's "symptoms would not interfere with satisfactory completion of a normal workday/week or require an unreasonable number of rest or cooling off periods." Tr. 417.

In August 2009, Dr. Karl R. Bodtorf examined Austin on one occasion and at the request of Austin's counsel. Dr. Bodtorf reviewed Austin's medical records, administered a psychological evaluation, and completed a Mental Residual Functional Capacity Assessment. Tr. 487-93. Regarding the results of the psychological evaluation, Dr. Bodtorf wrote that "[i]n general, there were indications suggesting that [Austin] tended to portray herself in an especially negative or pathological manner. The results therefore are likely to be a distortion of her clinical picture . . . ." Tr. 489-90. Nevertheless, Dr. Bodtorf found that the evidence "lend[ed] support to the working diagnosis of a bipolar disorder with psychotic features" and concluded, "It is more probable than not that her psychiatric symptomatology would surface at a level of intensity and frequency which would render her an unreliable resource to an employer." Tr. 491. Finally, in his Residual Functional Capacity Assessment, Dr. Bodtorf determined Austin had "moderately severe" and "severe" limitations in understanding

and memory, sustained concentration and persistence, social interaction, and adaptation. Tr. 492-93.

In October 2009, Nurse McLain provided a statement that summarized her treatment of Austin between 2004 and 2008. Tr. 494. Nurse McLain stated that she "believe[s] that [Austin's] persistent psychotic symptoms were her main problem in functioning and that she felt depressed because she had those symptoms." Id. Nurse McLain further opined that "Austin suffers from [a] severe chronic mental illness," that she "would not even be able to do simple tasks when she is overwhelmed by her anxiety and paranoia," and that she "would likely decompensate in the face of ordinary work stressors." Id.

### C.     ALJ's Decision

The ALJ employed a five-step sequential evaluation process to determine whether Austin was disabled from June 1, 2003 through the date of his decision. The ALJ first found that Austin did not engage in substantial gainful activity during the period at issue. Second, the ALJ found Austin suffered from the severe impairment of mood disorder. Third, the ALJ found Austin's impairments did not meet or equal the criteria of an impairment listed in the applicable regulations. Tr. 21-23.

Before reaching the fourth step, the ALJ made an assessment that Austin retained the residual functional capacity to perform work at all exertional levels but that involved only one- to two-step tasks in a low-stress environment with occasional contact with the public. Tr. 24. The ALJ determined that the opinions of Dr. Bodtorf and Nurse McLain regarding Austin's limitations were "not entitled to controlling weight" and also found Austin's descriptions of her subjective symptoms to be incredible. Tr. 26, 30. At the

fourth step, the ALJ found Austin could not perform her past relevant work.  Finally, at the fifth step, the ALJ found Austin could perform jobs existing in significant numbers in the national economy and concluded Austin was not disabled during the period at issue. Tr. 25-32.

## II.   STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the magistrate judge's R&R to which specific, written objections are made.  28 U.S.C. § 636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of the magistrate judge.  See Thomas v. Arn, 474 U.S. 140, 149-50 (1985).  The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination rests with this court.  Mathews v. Weber, 423 U.S. 261, 270-71 (1976).

Judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  "Substantial evidence has been defined . . . as more than a scintilla, but less than [a] preponderance."  Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964).  In other words, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).  "[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence."  Hays, 907 F.2d at 1456.

### III.   DISCUSSION

Austin objects to the R&R on three grounds:  (1) the ALJ erred in rejecting the opinion evidence of Nurse McLain; (2) the ALJ erred in rejecting the opinion evidence of Dr. Bodtorf; and (3) the ALJ erred in relying in part on Austin's noncompliance with medication to discount her credibility.

### A.     Nurse McLain

First, Austin objects that the ALJ erred in rejecting the opinion evidence of Nurse McLain.  In his decision, the ALJ found that Nurse McLain's opinion was "not probative in assessing the claimant's mental limitations" and "not entitled to controlling weight." Tr. 30.  The magistrate judge determined that "Austin has not shown that the opinion of Nurse McLain was improperly discounted in light of other evidence in the record which undermined it."  R&R 9.

Under the Social Security Regulations, only "acceptable medical sources" can establish the existence of a medically determinable impairment and be considered treating sources whose opinions may be entitled controlling weight.  SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).  "Nurse practitioners" are not acceptable medical sources; the information they provide "cannot establish the existence of a medically determinable impairment."  Id.; see also 20 C.F.R. § 404.1513(a).  Instead, such information "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939, at *2.

When evaluating opinion evidence from someone other than an acceptable medical source, an ALJ can apply the factors for considering medical opinions from

acceptable medical sources found at 20 C.F.R. § 404.1527(c).  The ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ]'s reasoning, when such opinions may have an effect on the outcome of the case."  SSR 06-03p, 2006 WL 2329939, at *6.

As a nurse practitioner, Nurse McLain's opinion is not entitled to controlling weight.  Ashmore v. Colvin, No. 11-2865, 2013 WL 837643, at *3 (D.S.C. Mar. 6, 2013).  The ALJ properly determined the weight due Nurse McLain's opinion by considering its consistency with other evidence and other factors that tended to support or refute the opinion.  For example, the ALJ wrote that Nurse McLain's "statement that the claimant has continued to have problems[] despite medication is not accurate."  Tr. 30.  The record evidence cited by the ALJ provides substantial evidence to support this finding.  See id. (citing Tr. 354-76); Hays, 907 F.2d at 1456 (holding that it is the ALJ's responsibility, not the court's, to determine the weight of the evidence and resolve conflicts of evidence).  In addition, the ALJ was entitled to take into consideration that Austin "ha[d] not been seen by Ms. McLain in over 1 ½ years."  Tr. 30.  Contrary to plaintiff's suggestion, this is a permissible reason for giving less weight to an opinion.  See 20 C.F.R. § 404.1527(c)(6) (providing that extent of familiarity of other information in the case record is a relevant factor to consider in deciding the weight to give an opinion).

Because the ALJ explained the reasons for the weight given to Nurse McLain's opinion and the court can "follow the [ALJ's] reasoning," SSR 06-03p, 2006 WL 2329939, at *6, the court overrules Austin's first objection to the R&R.

### B.     Dr. Bodtorf

Second, Austin objects that the ALJ improperly assessed the opinion evidence submitted by Dr. Bodtorf.  In his decision, the ALJ found that Dr. Bodtorf's opinions were "not entitled to controlling weight."  Tr. 30.  The magistrate judge determined that "[t]he ALJ provided several reasons for rejecting Dr. Bodtorf's opinions."  R&R 6.  She concluded, "Austin's argument that the ALJ's rejection of Dr. Bodtorf's opinion was unsupported by substantial evidence [is] without merit."  Id. at 7.

In determining the weight to which an examining physician's opinion is entitled, the ALJ must consider the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship.  20 C.F.R. § 404.1527(c)(2).  The ALJ did just that.  See Tr. 22 ("The claimant was examined by Karl Bodtorf, Psy.D., at the request of her attorney, on August 18, 2009."); Tr. 23 ("The claimant was administered The Personality Assessment Inventory [by Dr. Bodtorf] . . . ."); id. ("Mr. Bodtorf also completed a document identified as 'Mental Residual Functional Capacity Assessment' . . . .").

The ALJ must also consider the supportability of an opinion and its consistency with the record as a whole.  20 C.F.R. § 404.1527(c)(3)-(4).  This was done as well.  See Tr. 23 (noting that test evidence indicated it was "likely a distortion of her clinical picture"); id. ("Despite the questionable results of the [Personality Assessment Inventory] with probable exaggeration, [Dr.] Bodtorf concluded that the results were 'relatively' consistent with [Austin's] clinical picture . . . ."); Tr. 26 (noting that Austin made statements to Dr. Bodtorf that were inconsistent with other evidence); Tr. 30 (concluding that "Dr. Bodtorf's findings and conclusions are largely based upon the subjective

10

allegations of the claimant and are not consistent with the longitudinal evidence of record"); id. ("Dr. Bodtorf notes that claimant's responses on personality testing are not valid; yet, he opines that the personality profile identified in testing is consistent with her clinical picture and formulates his opinion as to her mental limitations based upon the skewed data."). These findings were supported by substantial evidence and not contrary to law.

In addition, the ALJ pointed out that Dr. Bodtorf's statement that Austin is disabled is an opinion reserved for the Commissioner. This finding was in accordance with the Social Security Regulations. See 20 C.F.R. § 404.1527(d)(1). Finally, it was within the ALJ's discretion to afford more weight to the opinions of a state agency medical consultant than to Dr. Bodtorf. See Smith v. Schweiker, 795 F.2d 343, 345-46 (4th Cir. 1986) (stating that the opinion of a non-examining physician can constitute substantial evidence to support the ALJ's decision); Stanley v. Barnhart, 116 F. App'x 427, 429 (4th Cir. 2004) (disagreeing with argument that ALJ improperly gave more weight to residual functional capacity assessments of non-examining state agency physicians over those of examining physicians).[3]

For these reasons, plaintiff's second objection is overruled.

### C.     Noncompliance with Medication

Third, Austin objects that the ALJ erred by relying in part on Austin's noncompliance with medication to discount her credibility. The ALJ found both that

---

[3] Austin also raises an issue regarding the ALJ's rejection of the Mental Residual Functional Capacity Assessment completed by Dr. Bodtorf on the basis that the terms used on the form were not defined in a manner consistent with the Social Security Rulings. Austin "concede[s] that Dr. Bodtorf uses different definitions." Pl.'s Br. 22. The magistrate judge recommended that, at any rate, this issue need not be addressed because the ALJ's rejection of Dr. Bodtorf's opinions is supported by substantial evidence for several other reasons. R&R 7 n.1. The court agrees with this assessment by the magistrate judge.

"[n]umerous inconsistencies in the evidence detract from claimant's credibility" and that "[t]he claimant's credibility is further eroded by a consistent lack of medical compliance." Tr. 26.

Plaintiff contends that Social Security Ruling 82-59 applies in this case. This Ruling "provides that, before a person is denied benefits for failure to follow prescribed treatment, he will be afforded an opportunity to undergo the prescribed treatment or to show justifiable cause for failing to do so." Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984). The magistrate judge determined that "this Ruling is not applicable in Austin's case, since the ALJ did not deny benefits for failure to follow prescribed treatment." R&R 8. The court agrees. As Austin concedes, "It is true that the ALJ did not specifically say that he found Austin disabled when she was non-compliant" with medication. Pl.'s Obj. 21. Instead, the ALJ considered Austin's noncompliance when assessing her credibility and the medical opinion evidence.[4] See Myers v. Comm'r of Soc. Sec. Admin., 456 F. App'x 230, 232 (4th Cir. 2011) (citing Owen v. Astrue, 551 F.3d 792, 800 n.3 (8th Cir. 2008)) (noting that noncompliance may be used for purposes of determining weight of evidence).

Therefore, plaintiff's third objection is overruled.

## IV.   CONCLUSION

Based on the foregoing, the court **ADOPTS** the magistrate judge's R&R and **AFFIRMS** the Commissioner's decision.

---

[4] For example, the ALJ did not use the ample evidence of Austin's noncompliance with medication, *ipso facto*, to reject Nurse McLain's opinion. Instead, the ALJ noted that although some of Nurse McLain's treatment records report that Austin was not doing well, in many of those instances, Austin was not complaint with medication. However, the ALJ observed that when Austin was "compliant with mood stabilizer and anti-psychotic [medications] she functioned 'normally.'" Tr. 30. This was a proper observation by the ALJ. See Myers, 456 F. App'x at 232 (citing Owen, 551 F.3d at 800 n.3).

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 21, 2013**
**Charleston, South Carolina**

13